**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NIURKA BARREIRO, *et al.*,

*Plaintiffs*,

v.

UNITED STATES OF AMERICA,

*Defendant*.

Civil Action No. 24-980 (SLS)
Judge Sparkle L. Sooknanan

**MEMORANDUM OPINION**

In July 2022, Niurka Barreiro and Ruben Muro Suarez were walking the South Elm Walk of the National Mall when a tree limb fell and struck them. Ms. Barreiro and Mr. Muro Suarez sued the United States for negligence under the Federal Tort Claims Act (FTCA), alleging that the Park Service failed to inspect and maintain the tree, to prune or remove the limb before it fell, and to place adequate warning signs. The United States now moves for summary judgment, arguing that it is immune from suit under the FTCA's "discretionary function exception," or alternatively, that the alleged misconduct was not negligent under District of Columbia law. The Court agrees that Congress did not waive sovereign immunity for the Plaintiffs' claim in the FTCA because the alleged government misconduct involved "discretionary functions." 28 U.S.C. § 2680(a). The Court thus dismisses the case for lack of subject-matter jurisdiction and denies the Defendant's motion as moot.

## BACKGROUND

### A. Factual Background

The Court draws the facts from the Defendant's Statement of Material Facts, the Plaintiffs' Statement of Facts, and the underlying materials referenced in those statements. *See* Def.'s

Statement of Undisputed Material Facts (DSOF), ECF No. 21-1; Pls.' Statement of Disputed Material Facts (PSOF), ECF No. 22-2; Def.'s Counter-Statement of Material Facts, ECF No. 23-1. The Court assumes the facts in those statements to be true unless they have been specifically disputed, and it assumes the truth of other undisputed statements in the record. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[1]

**1. The National Park Service and the National Mall**

The National Mall and Memorial Parks is the Nation's most visited national park, receiving over 25 million visitors a year. Larson Rep. at 3, Pls.' Ex. 7, ECF No. 22-9; Morrison Dep. at 20:11–15, Def.'s Ex. B, ECF No. 21-5. The National Park Service (NPS) regulates and maintains the park, which covers 6,000 acres and contains an "urban forest" of about 20,000 trees. Morrison Dep. at 18:21–19:5; DSOF ¶¶ 3, 10, 15. One of the park's busiest areas is the South Elm Walk, which runs between the Lincoln Memorial and the World War II Memorial. Larson Rep. at 4. Heavy foot traffic compacts the soil there, meaning that "the trees don't get an . . . optimal amount of nutrients, oxygen or water[.]" Morrison Dep. at 20:11–21. The South Elm Walk contains about 170 elm trees, a monoculture dating to the 1930s that is among the Walk's "greatest challenges" for the park keepers because "one blight, one disease, and it can wipe out an entire stand[.]" Morrison Dep. at 19:8–22; DSOF ¶ 11.

Matthew Morrison, who served as the National Mall's Tree Crew Supervisor in July 2022, oversaw the care of the park's 20,000 trees. DSOF ¶¶ 1, 9–10; Morrison Decl. ¶ 1, ECF No. 21-3. Mr. Morrison is an Internationally Certified Arborist with over 40 years of experience in the tree-care industry. Morrison Decl. ¶¶ 3–4. In 2022, Mr. Morrison led an in-house tree crew of four or

[1] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

five workers, down from fifteen to twenty in the park's "fairly recent history." Morrison Dep. at 16:21–17:2, 25:5–12; PSOF ¶ 12. Mr. Morrison described the crew as "terribly understaffed" and "very compromised," but he said that the crew nevertheless "meet[s] [its] obligation." Morrison Dep. at 25:5–18, 26:10–17. Although the Park Service sometimes contracts out larger jobs, the in-house crew responds to "current events," including weather events such as windstorms and clearing dead limbs. Morrison Dep. at 15:11–16:20, 28:8–12; DSOF ¶¶ 12–14; PSOF ¶¶ 12–14.

As set out in its organic act, the mission of the Park Service is to "conserve the scenery, natural and historic objects, and wild life" within the National Mall and to "provide for the[ir] enjoyment . . . in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). NPS-77, the Park Service's Natural Resources Management Guideline, outlines "a general scheme" for a hazardous tree program and requires each park superintendent, "as appropriate," to "develop and implement a hazardous tree management plan" "tailored to a park's particular requirements[.]" NPS-77 at 349, 351, 358, Def.'s Ex. E, ECF No. 21-8. The Park Service has also issued Director's Order #50C, the "Public Risk Management Program," which sets out "guidelines for establishing a risk management process that focuses on the prevention of visitor injuries" and states that "[t]he means by which public safety concerns are to be addressed in each park falls under the discretion of the park's superintendent." Director's Order #50C at 2–3, Pls.' Ex. 6, ECF No. 22-8.

Mr. Morrison testified that his crew inspects the trees "several times a year," and when it finds dead limbs, it "immediately put[s] them into [the] workload." Morrison Dep. at 29:7–12, 78:19–79:5; DSOF ¶ 13. After a windstorm, "instead of doing [the] scheduled work that day," the crew canvasses the park for hazards, which Mr. Morrison then prioritizes and the crew "take[s]

care of . . . immediately." Morrison Dep. at 30:5–16; DSOF ¶¶ 15–16. As Mr. Morrison put it, they "focus on risk-based tree hazard management through cyclic tree inspections, assessments, and cordoning off the imminent tree risk dangers until [they] can dispatch a team to mitigate the tree hazard." Morrison Decl. ¶ 12.

On January 8, 2022, Mr. Morrison performed a "[L]evel 1" tree risk assessment under the American National Standard Institute (ANSI) A300 standard, which consists of a ground-based visual inspection of the 340 trees on the North and South Elm Walks. Morrison Dep. at 84:1–13, 86:10–87:12; DSOF ¶¶ 17–18; PSOF ¶¶ 17–18. Mr. Morrison saw "routinely dead limbs," which prompted him to seek a hazard-mitigation pruning contract to prune every elm on both the North and South Walks. Morrison Dep. at 84:1–13, 86:10–87:12; Various Records at 3, 11, Def.'s Ex. D, ECF No. 21-7; DSOF ¶¶ 17–20; PSOF ¶¶ 17–20. The contract was submitted on January 11, 2022, but not awarded until late July 2022, and the contractor, Ross Tree Experts, had not begun work by the time of the incident giving rise to this lawsuit. Morrison Dep. at 70:1–11, 76:1–7.

### 2. The July 12, 2022, Storm

On the evening of July 12, 2022, a severe thunderstorm passed over Washington, D.C. DSOF ¶ 22; PSOF ¶ 22. Winds exceeded fifty miles per hour, damaging trees throughout the National Mall. Morrison Dep. at 84:14–22, 87:18–88:4. The next morning, Mr. Morrison walked the North and South Elm Walks to inspect for storm damage and tree hazards. *Id.* at 84:14–22; DSOF ¶¶ 23–24. He spent at least an hour on the South Elm Walk, looking for potential hazards. Morrison Dep. at 101:1–14. He recalled seeing two or three fractured limbs, some of which were still caught in the trees. *Id.* at 89:11–91:9.

In accordance with protocol, the tree crew was dispatched to inspect the park and remove fallen debris and hanging limbs. Morrison Dep. at 85:1–14; DSOF ¶¶ 23–24. Over the next several

days, Mr. Morrison and his crew continued inspecting the park for storm damage. DSOF ¶ 25; Morrison Dep. at 91:14–92:16. Workers used warning signs, cones, and red danger tape to mark their work zones and areas where an identified hazard was awaiting removal. Morrison Dep. at 94:2–95:18; DSOF ¶ 26. After the crew removed an identified hazard, it took down the warnings. PSOF ¶ 26; Morrison Dep. at 95:5–18. By July 16, the crew had finished the post-storm cleanup, and no signs remained on the South Elm Walk warning visitors of possible hazards or falling branches. DSOF ¶ 26–27; PSOF ¶¶ 26–27.

Mr. Morrison explained that the in-house crew's practice was not to leave warnings in place after completing cleanup and hazard-mitigation work. Morrison Dep. at 95:2–97:11. He stated that posting warning signs at every visible defect would "unreasonably tax [the Park Service's] resources," "make the park look like a police crime scene, deterring from the natural beauty of nature," and "likely cause a false sense of security" because "hidden risks would still abound." Morrison Decl. ¶¶ 10–12; DSOF ¶¶ 30–31.

**3. The Incident**

On the morning of Saturday, July 16, 2022, the Plaintiffs, a couple from Florida, visited the National Mall. They were walking along the South Elm Walk when "[s]uddenly and without warning, a large tree branch fell on top of them, pushing both of them to the ground." Compl. ¶ 19, ECF No. 1; DSOF ¶¶ 5–6. Ms. Barreiro "lost consciousness and sustained severe injuries on her head, face, right knee, and right ankle." Compl. ¶ 20. And Mr. Muro Suarez "suffered severe pain in his head and left shoulder." Compl. ¶ 21.

Several passersby stopped to help Ms. Barreiro and Mr. Muro Suarez, and one called 911. Compl. ¶ 22; Def.'s Ex. D at 6–10 (photos of the fallen branch and incident). Emergency personnel transported Ms. Barreiro and Mr. Muro Suarez to the emergency department at George

Washington University Hospital, where Ms. Barreiro "remained unconscious for hours." Compl. ¶¶ 23–24. Park Sergeant Norlith Roberts and Park Ranger Marcella Franklin also responded to the scene and photographed the fallen branch. DSOF ¶ 7; Roberts Dep. at 17:14–18:12, 41:7–21, ECF. No. 21-4. Sergeant Roberts later prepared an incident report. The branch was removed, and the tree from which it fell was never identified. Morrison Dep. at 35:1–37:8.



*Figure 1. Photograph of the fallen tree branch produced in discovery. Def.'s Ex. D at 6.*

The Plaintiffs allege that "Ms. Barreiro sustained severe and permanent injuries, including, but not limited to closed head injury with loss of consciousness, head injury, scalp hematoma, pain in thoracic spine, muscle spasms in thoracic spine, concussion, and abrasions and contusions on her head, face, right knee, and right ankle." Compl. ¶ 25. They further allege that both Plaintiffs have incurred "substantial medical expenses" and "substantial wage loss and loss of employment

opportunities," and suffer "extreme physical and emotional pain, depression, anxiety . . . , and anguish, as well as other damages." Compl. ¶¶ 26, 28.

### B. Procedural Background

After the incident, Ms. Barreiro and Mr. Muro Suarez each filed an administrative claim with the Department of the Interior (DOI). Compl. ¶ 10. After DOI denied their claims, the Plaintiffs filed this suit against the United States asserting one count of negligence. Compl. ¶ 16–17. The Complaint alleges that the United States, as the owner and manager of the National Mall, had a duty to maintain its trees in a safe condition, to "correct and alleviate any dangerous conditions," and to "warn pedestrians of any dangerous conditions." Compl. ¶¶ 30–32. It alleges that the United States breached those duties by failing to "properly inspect and maintain the trees on The National Mall," to "properly and timely prune and/or remove the tree at issue," to "place appropriate warning signs and/or caution tape," and to "adhere to the applicable national standard of care for tree maintenance." Compl. ¶¶ 30–35. Ms. Barreiro seeks $3,500,000 plus interest and costs; Mr. Muro Suarez seeks $2,500,000 plus interest and costs. Compl. at 9.

During discovery, the Plaintiffs deposed Sergeant Roberts and Mr. Morrison, and the Parties later stipulated that Mr. Morrison's testimony "shall be and is binding upon the United States" on sixteen topics, including how the Park Service inspects and maintains the Mall's trees and its policies on warning signs. Stipulation Regarding Morrison Dep., Pls.' Ex. 2, ECF No. 22-4.

The Parties each retained an expert. The Plaintiffs' expert, Christopher Larson, is a Board Certified Master Arborist. Larson Dep. at 9:13, ECF No. 21-10. After reviewing the photographs of the tree limbs, Mr. Larson wrote that the primary fracture "did not appear aged, desiccated, and weathered, which indicates the initiation of failure was recent," and that it "likely occurred during

the July 12th storm or in the recent weeks prior, and was not addressed by NPS post storm." Larson Suppl. Rep. at 2–3, Pls.' Ex. 9, ECF No. 22-11; DSOF ¶ 8; PSOF ¶ 8. He testified at his deposition that after the storm, the Park Service should have conducted a "Level 2" inspection of the trees that had lost limbs and nearby trees, and that if it could not do so, it should have restricted access or posted warnings. Larson Dep. at 91:16–93:13, 115:6–17. Mr. Larson further acknowledged that "there is not one [national standard of care for tree management]" but instead "a compilation of consensus standards and standards of care associated with arboricultural work." *Id.* at 133:18–22; DSOF ¶ 33; PSOF ¶ 33.

The Government's expert, Russell E. Carlson, is a Board Certified Master Arborist and Registered Consulting Arborist. Carlson Rep. at 3, Def.'s Ex. F, ECF No. 21-9. He visited the incident site in March 2025, but could make only a "tentative identification" of the tree that allegedly injured the Plaintiffs. *Id.* at 5–6. In his opinion, the Park Service "met the standard of care as defined within the NPS-77 policy statement," which he viewed as superseding the standards on which Mr. Larson relied. *Id.* at 1. He also analyzed the photograph of the limb as "show[ing] that the bark of the limb was intact prior to its falling, so any internal fracture or defect in the wood would not likely have been discernible during a ground-level inspection." *Id.* at 11.

Following discovery, the United States moved for summary judgment. ECF Nos. 21, 21-1, 21-3–21-10. That motion is now ripe. ECF Nos. 22, 22-2–22-14; ECF Nos. 23, 23-1.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To defeat summary judgment, the nonmovant must "designate specific facts showing that there is a genuine issue for

trial." *Id.* at 324 (cleaned up). In considering a motion for summary judgment, a court "may not make credibility determinations or otherwise weigh the evidence." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016) (Jackson, J.). Instead, it must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* Summary judgment is appropriate only if, viewing the evidence in that light, the court concludes that no reasonable jury could find for the nonmovant. *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018).

The plaintiff bears the burden of establishing subject matter jurisdiction, including that the government has waived sovereign immunity. *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) ("A party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity."); *see also Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008) (same after the government invoked the discretionary-function exception at the motion-to-dismiss stage); *Cope v. Scott*, 45 F.3d 445, 450 (D.C. Cir. 1995) (reviewing grant of summary judgment in favor of the government on discretionary-function grounds *de novo* and reasoning that "[a]s long as the District Court's legal conclusion was correct, its grant of summary judgment was appropriate, for we perceive in the record no genuine issues of fact material to the jurisdictional issue").[2]

[2] Although the D.C. Circuit has held at the motion-to-dismiss stage that a plaintiff bears the initial burden of showing that her claims fall outside of the discretionary function exception, *Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008), it has not addressed whether, once a plaintiff establishes FTCA jurisdiction, the burden shifts to the government to show that the discretionary function exception applies. *See Donahue v. United States*, 870 F. Supp. 2d 97, 104 n.4 (D.D.C. 2012) (noting that "[w]hile the D.C. Circuit has not held that the burden of proof ever shifts to the government, it clearly agrees that plaintiffs bear an initial jurisdictional burden of pleading facts that fall outside the discretionary function exception"); *Walen v. United States*, 246 F. Supp. 3d 449, 456 n.6 (D.D.C. 2017) (explaining the divided authority from other circuits and acknowledging that "the D.C. Circuit has not opined on this issue") (citing cases). Other Circuits have divided on the question. *Compare*, *e.g.*, *Welch v. United States*, 409 F.3d 646, 651 (4th Cir.

## DISCUSSION

The Plaintiffs bring this negligence action against the United States under the FTCA. They allege that the Park Service failed to maintain and inspect the trees along the South Elm Walk of the National Mall with reasonable care, failed to prune or remove dangerous branches, and failed to warn visitors of the danger or restrict access to the area. Compl. ¶ 35. The FTCA waives sovereign immunity for the torts of federal employees acting within the scope of their employment. But the FTCA contains an exception, invoked by the Government here, that preserves immunity for claims based on the performance of, or the failure to perform, "a discretionary function or duty." *Id.* § 2680(a). Because the discretionary function exception is a jurisdictional bar, *Loughlin v. United States*, 393 F.3d 155, 162 (D.C. Cir. 2004), the Court must address it before reaching the merits. The Court concludes that Congress intended to shield the alleged misconduct here under the discretionary function exception. It therefore lacks subject-matter jurisdiction over the Plaintiffs' negligence claim.

### A. The Discretionary Function Exception

It is axiomatic that "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). In 1946, Congress enacted the FTCA, waiving the United States' sovereign immunity for certain tort claims in order "to remedy and deter tortious conduct by federal personnel," *Loumiet v. United States*, 828 F.3d 935, 941 (D.C. Cir. 2016), and "to compensate the victims of negligence in the conduct of governmental activities," *Indian Towing Co. v. United States*, 350 U.S. 61, 68 (1955). In general, the FTCA

2005) (holding that the plaintiff bears the burden "to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply"), *with Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008) (holding that the government bears the burden to show the applicability of the discretionary function exception). This Court need not resolve the question here. Even assuming that the Government bears the ultimate burden, and viewing the record in the light most favorable to Plaintiffs, the Government has established that the exception applies.

grants federal district courts jurisdiction over civil suits seeking money damages against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA makes the Government answerable "in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 2674.

But the FTCA's waiver of sovereign immunity is subject to the exceptions enumerated in 28 U.S.C. § 2680. Here, the Government invokes the discretionary function exception. *Id.* § 2680(a). Described by Congress as "a highly important exception," *Dalehite v. United States*, 346 U.S. 15, 30 (1953) (cleaned up), the exception preserves the Government's immunity from claims

> based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused,

28 U.S.C. § 2680(a). The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). Its purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (quoting *Varig Airlines*, 467 U.S. at 814). The discretionary function exception is a limit on the Court's power, not a defense on the merits. *See Loughlin*, 393 F.3d at 162 (describing the

exception as a "jurisdictional barrier" that a plaintiff must overcome before a district court has "authority to address the merits of [FTCA] claims").

To determine whether conduct falls within the exception, courts apply a two-step test that tracks the language of Section 2680(a). *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988); *Gaubert*, 499 U.S. at 322–23; *Shuler v. United States*, 531 F.3d 930, 933 (D.C. Cir. 2008). First, courts ask whether the challenged conduct was discretionary; that is, whether it "involv[ed] an element of judgment or choice." *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). If it did, the second step asks whether the conduct "is of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23 (quoting *Berkovitz*, 486 U.S. at 536). At the second step, the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323 (quoting *Berkovitz*, 486 U.S. at 537).

The Plaintiffs argue that they prevail at either prong of the discretionary function exception test. The Court addresses each in turn.[3]

**1. Whether the Conduct Involved Judgment or Choice**

The first step asks whether the challenged conduct "involv[ed] an element of judgment or choice." *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). Conduct is not

[3] The Plaintiffs urge the Court to forgo application of the two-part discretionary function test altogether because the Defendant affirmatively "undertook responsibility for the maintenance of the trees." Pls.' Opp'n to Def.' Mot. for Summ. J. at 16–21 (Opp'n), ECF No. 22. But this misunderstands the nature of the discretionary function exception and the limits that it imposes on this Court's jurisdiction. "The discretionary function exception is a barrier to subject matter jurisdiction," and "[a] district court thus has no authority to address the merits of claims allegedly arising under the FTCA in cases in which the plaintiff is unable to overcome this jurisdictional barrier." *Loughlin v. United States*, 393 F.3d 155, 162 (D.C. Cir. 2004). In determining whether a claim falls under the discretionary function exception, the question of whether the United States was negligent is "irrelevant." *Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991). "The sole question before [the Court] is whether the conduct upon which plaintiffs rely for recovery falls within the discretionary function exception." *Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287, 288 (9th Cir. 1989).

discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because then "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. A binding directive removes the discretion, and "[f]ailure to abide by such directives opens the United States to suit under the FTCA." *Loughlin*, 393 F.3d at 163. As the Supreme Court has put it, "if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect." *Berkovitz*, 486 U.S. at 536.

The Plaintiffs argue that the Government's reliance on the discretionary function exception fails at step one because two Park Service guidance documents provide binding directives: (1) the "Hazardous Trees" chapter of the Natural Resources Management Guideline (NPS-77), and (2) Director's Order #50C, "Public Risk Management Program." Pls.' Opp'n to Def.' Mot. for Summ. J. (Opp'n) at 21, ECF No. 22. As the Plaintiffs see it, these two documents "prescribed courses of action that NPS was required and failed to follow." Opp'n at 21. They acknowledge that "some portions of the broader NPS-77 and [Director's Order] [#]50C can be read to afford the government discretion," but they insist that "the documents do set forth specific requirements that the United States disregarded." Opp'n at 22. The Court disagrees. Neither NPS-77 nor Director's Order #50C "specifically prescribe[] a course of action" for the type of conduct challenged here. *Berkovitz*, 486 U.S. at 536. Although the documents set forth objectives, they leave to park officials the responsibility of weighing various factors and deciding how best to implement the overall frameworks. Both documents contain explicit language giving those officials discretion to design and implement hazardous-tree programs suited to the circumstances of each park.

NPS-77's stated purpose is "to outline a hazardous tree program . . . that provides the foundation for each park to implement its own hazardous tree management plan[.]" NPS-77 at 349.

It states that actions for dealing with hazardous trees should "result from an evaluation of the tree as a functional and aesthetic component of the landscape, in addition to its potential hazard." *Id.* at 350. It further provides that a "system of notification or warnings *may be warranted* in" situations where "particular weather or site conditions can make a group or section of trees in a public activity area hazardous." *Id.* (emphasis added). NPS-77 also states that each hazardous tree management plan "must be tailored to a park's particular requirements," that trees near public use areas "should be systematically inspected for flaws," and that "particular events such as wind storms . . . *may call* for special inspections." *Id.* at 351–52 (emphasis added). It makes "each superintendent, as appropriate," responsible for "develop[ing] and implement[ing] a hazardous tree management plan as an action plan." *Id.* at 358. As is evident, these provisions establish a general framework for managing hazardous trees while leaving park officials discretion over the methods of inspection, mitigation, and warning.

Director's Order #50C likewise gives significant discretion to park officials. It makes it "the responsibility of park superintendents and their partners . . . to make a reasonable effort to assess risks in their respective parks, to eliminate or mitigate the risks when reasonable and appropriate, and/or to communicate risks to the public within the limits of available resources as determined by park managers." Director's Order #50C at 2. It further provides that "[t]he means by which public safety concerns are to be addressed in each park *falls under the discretion* of the park's superintendent," and it states that it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law." *Id.* at 2–3 (emphasis added). Director's Order #50C thus contains suggestive—not mandatory—language.

Indeed, other courts have read these guidance documents to preserve agency discretion. In construing NPS-77's hazardous-tree chapter, the Third Circuit emphasized that its provisions

"explicitly state that they 'may be used'" and thus "do not mandate any particular methods of hazardous tree identification or removal" but instead "make suggestions that Park officials are free to accept or reject." *Merando v. United States*, 517 F.3d 160, 170 (3d Cir. 2008). There, as here, the Park Service followed an "unwritten plan for identifying and removing hazardous trees in the Park," which included "inspect[ing] trees on foot," and once a hazardous tree was identified, "tak[ing] steps to manage [that tree] the same or next day, depending on the availability of proper equipment." *Id.* at 170. The Third Circuit concluded that "the controlling statutes, regulations, and policies that led to the creation of the Park Service's unwritten plan did not mandate any particular methods of hazardous tree management." *Id.* at 172; *see also Moon v. United States*, No. 06-cv-0328, 2008 WL 11336115, at *4 (E.D. Wash. Aug. 4, 2008) ("NPS-77's plain language affords broad discretion for Glacier officials to implement a hazardous tree management plan according to the park's individualized needs.").

Likewise, in *Walen v. United States*, a court in this District concluded that the Director's Order #50C and NPS-77 "largely leave public safety determinations to the discretion of each national park," and observed that the Director's Order "reserves to superintendents discretion to determine the level of program resources and the types of programs needed to manage visitor risk[.]" 246 F. Supp. 3d 449, 458 (D.D.C. 2017) (cleaned up). Although *Walen* ultimately found for the plaintiffs on the first step, it did so only because the park in question, Rock Creek Park, had an additional park-specific directive: a "Draft Tree Plan" which "outline[d] the specific policies and practices applicable to Rock Creek Park" and "mandate[d] that certain actions be taken by Park staff." *Id.* The Draft Tree Plan detailed mandatory record-keeping, inspection and maintenance requirements: "NPS staff is mandated to conduct monthly inspections of trees on a primary road, bi-annual inspection of trees that pose a risk to the public, and comply with specific

industry standards for tree care. NPS staff is also mandated to document inspections and corrective actions taken, as well as keep other records." *Id.* at 458–59 (cleaned up). The *Walen* court contrasted the Draft Tree Plan to Director's Order #50C and NPS-77 and concluded that it was the Draft Tree Plan's "clear mandates [that] remove the immunity shield provided by the discretionary function exception in the FTCA." *Id.* at 459; *accord Kim v. United States*, 940 F.3d 484, 488 (9th Cir. 2019) (holding that the discretionary function exception did not shield Yosemite officials' tree evaluations because "Yosemite Park Directive No. 25" mandated that they "evaluate the risk posed by trees" using "the 'Seven-Point' (Mills and Russel 1980) system," with "specific criteria for how to rate each component based on the tree's visible features and the nature of the surrounding area" (cleaned up)).

No comparable park-specific directive exists here. As Mr. Morrison explained, "[n]o law, regulation, or policy mandates how the NPS manages hazardous trees or the use of signage on the National Mall." Morrison Decl. ¶ 9; *see* DSOF ¶ 28.[4] He instead described the National Mall's tree maintenance and inspection protocols as reflecting park-specific concerns and industry standards,

[4] The Plaintiffs urge the Court to disregard Mr. Morrison's declaration as "self-serving," and as "post-deposition, untested," and "a dangerous combination of hearsay and conclusory." Opp'n at 26–27. But Federal Rule of Civil Procedure 56 expressly permits a court to consider a declaration at summary judgment so long as it is "made on personal knowledge," "set[s] out facts that would be admissible in evidence," and "show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Those requirements are satisfied here: Mr. Morrison would be competent to testify at trial, and his experience supervising the National Mall's tree crew supplies a foundation for his descriptions of its staffing, work practices, and the demands of displaying warnings. *See* Morrison Dep. at 22:4–6, 23:18–25:20, ECF No. 21-5; Morrison Decl. ¶¶ 1–6, 11–12, ECF No. 21-3. Moreover, the Plaintiffs identify no specific contradiction between Mr. Morrison's statements and his deposition testimony. Nor does the Plaintiffs' argument that the declaration is "self serving" carry any weight. *See Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 374 (D.C. Cir. 2020) ("[T]he term 'self serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." (quoting *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013))). For these reasons, the Court considers the uncontroverted factual descriptions in Mr. Morrison's declaration in deciding the instant motion for summary judgment.

including ANSI A300 for inspections and ANSI Z133 for work zones, rather than requirements imposed by a park directive. Morrison Dep. at 84:1–9, 96:10–19. Mr. Morrison also testified that the park has no written protocol for inspecting a tree after a limb falls: "[W]e don't have it written that, you know, when the limb comes down, this is how you inspect the tree, and this is the methodology." *Id.* at 59:18–21.

In short, the Plaintiffs have identified no directive mandating how the Park Service should have inspected the Elm Walks after the July 12 storm, how it should identify or remove dangerous trees, or when it should warn visitors of potential hazards. Thus, the Court finds for the Government on the first prong of the discretionary function test.

**2. Whether the Conduct was Based in Policy Considerations**

The second prong presents a closer question. It asks whether the Park Service's conduct is the sort of conduct "that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23 (quoting *Berkovitz*, 486 U.S. at 536). Even a discretionary act within the scope of a federal official's employment falls outside the exception if it "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n.7. In carving out the exception, Congress intended "to prevent '[j]udicial intervention in . . . the political, social, and economic judgments' of governmental—including regulatory—agencies." *Berkovitz*, 486 U.S. at 539 (quoting *Varig Airlines*, 467 U.S. at 820). The second step thus asks whether the actions or decisions "were within the range of choice accorded by federal policy and law and were the results of policy determinations." *Id*. at 538. As the D.C. Circuit has explained, "[w]hat matters is not what the decisionmaker was thinking, but whether the type of decision being challenged is grounded in social, economic, or political policy." *Cope*, 45 F.3d at 449.

On this prong, the focus is on the specific conduct at issue. Although it is not entirely clear, the Plaintiffs appear to challenge three omissions: the government's failure to "properly inspect and maintain the trees," to "properly and timely prune (or remove) any dangerous trees," and to "place warning signs or restrict access to the area." Opp'n at 14. And they argue that even if some of these omissions fall within the exception, their remaining theories should proceed. *Id.* at 30 n.11. The Court thus proceeds by assessing each challenged action. *See Cope*, 45 F.3d at 450–52 (analyzing the Park Service's road-maintenance and warning decisions separately and reaching different conclusions). It ultimately concludes that the discretionary function exception shields each all three alleged omissions at step two.

**a. The National Mall's Tree Maintenance and Inspection Regime**

First, the Plaintiffs allege that the Government negligently failed to implement an adequate system for tree care and inspection. Compl. ¶¶ 30–36. This conduct is protected at step two because the Park Service's choices about what kind of tree maintenance and inspection regime to employ at the National Mall are ones that are "inherently . . . grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993).

Decisions that "require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding" are protected. *Cope*, 45 F.3d at 450–51 (citation omitted) (holding that the Park Service's management of Beach Drive's road surface was immunized because the remedy "would require balancing factors such as Beach Drive's overall purpose, the allocation of funds among significant project demands, the safety of drivers and other park visitors, and the inconvenience of repairs as compared to the risk of safety hazards").

Here, the Plaintiffs challenge the breadth and intensity of the Park Service's response to the windstorm, including how it deployed a small crew across a large park. But those choices implicate competing policy considerations. Mr. Morrison's crew cares for about 20,000 trees across roughly 6,000 acres. DSOF ¶¶ 10, 12, 15; PSOF ¶ 12; Morrison Dep. at 25:5–18. After a windstorm, the crew suspends its scheduled work, surveys the park, and prioritizes the problems that it finds. DSOF ¶¶ 14–16; Morrison Dep. at 30:5–16. Mr. Morrison described his crew as "terribly understaffed," meaning that the choices about where to inspect, how intensively to inspect, and which work to prioritize require him to balance and weigh several competing factors. Morrison Dep. at 25:5–18, 30:5–16. The decisions that go into determining the tree care and maintenance are further informed by the overall purpose of the Park Service to "conserve the scenery, natural and historic objects, and wild life" within the National Mall while also "provid[ing] for the[ir] enjoyment of . . . in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). The Park Service's design of its tree care system bears on whether resources are available elsewhere in the park and whether trees are preserved for visitors' enjoyment.

Although the D.C. Circuit has not assessed a tree inspection and maintenance program under the discretionary function exception, the weight of authority from other Circuits supports the conclusion that the National Mall's tree program involves the kind of judgment that Congress intended to protect. *Merando* involved a tree that fell onto a roadway hitting a car and killing two passengers; the father filed an action alleging that the "Government negligently pruned and failed to find and remove the hazardous tree." *Merando*, 517 F.3d at 162. *Merando* held that the choice of "windshield inspections" in less-frequented areas over a program that would "individually inspect every potentially hazardous tree" was "a discretionary decision, driven by limited

resources[.]" *Id.* at 173. The Third Circuit added that "it is not only entirely appropriate that Government personnel have discretion as to what trees to inspect and how to make the inspections but necessary that they have that discretion*."* *Id.* at 174. Similarly, the Eleventh Circuit held that in choosing "a method of inspecting potentially hazardous trees, and . . . carrying out the plan," the Park Service would likely need to "weigh the risk of harm from trees in various locations, the need for other safety programs, the extent to which the natural state of the forest should be preserved, and the limited financial and human resources available." *Autery v. United States*, 992 F.2d 1523, 1531 (11th Cir. 1993). And the Ninth Circuit held that a maintenance worker who had inspected an oak and "never saw any reason to believe that it was dangerous" before it "buckled and crashed" onto a campsite was exercising protected discretion. *Lam v. United States*, 979 F.3d 665, 670–72 (9th Cir. 2020). The Ninth Circuit reasoned that "the decision of whether to cut down a tree is susceptible to competing policy considerations," including "safety, budget, staffing, wildlife and habitat preservation, impact on the natural vegetation, and aesthetics," and "[i]t is sufficient that [his] decisions would be susceptible to these policy considerations; he need not have actually weighed them." *Id.* at 681–82; *see also Hatcher v. United States*, 512 F. App'x 527, 530 (6th Cir. 2013) ("[T]ree inspection and removal is the sort of conduct inherently subject to important and unpredictable constraints like limited funds and manpower.").

In an attempt to characterize the challenged conduct as technical and thus outside the exception rather than policy-based, the Plaintiffs principally rely on *Walen*. *See* Opp'n at 24–26. But as at step one, the *Walen* court's step-two analysis turned largely on the park-specific directive that governed there. The court reasoned:

> Given the plain language of the mandates in the Draft Tree Plan for the management of the trees in Rock Creek Part [sic], to the extent that Park staff retain any discretion in the implementation of the governing regulations, the exercise of that discretion involves the application of scientific standards and expert judgments,

> which unlike the weighing of policy considerations, are not protected by the discretionary function exception.

*Walen*, 246 F. Supp. 3d at 464. *Walen* declined to immunize the application of technical criteria that the park had adopted (the ANSI standards written into Rock Creek Park's plan) because it did "not implicate NPS's policymaking regarding the balancing of competing considerations in preserving the Park while protecting public safety." *Id.* at 464–65. The court placed those judgments within the bucket of caselaw declining to exempt a "federal agency's application of scientific or expert professional judgment in carrying out ministerial tasks[.]" *Id.* at 465; *see also Kim*, 940 F.3d at 488–89 (holding that applying Yosemite's prescribed tree-rating criteria involved scientific and professional judgment); *Cope*, 45 F.3d at 452 (holding that the government's "engineering judgment" was not a matter of policy but more similar to the "objective scientific principles" that fell outside the exception (quoting *Berkovitz*, 486 U.S. at 545)).

But that is not at all true here. As discussed above, the Park Service was not required to follow any specific policy or technical criteria in maintaining and inspecting trees on the National Mall. In the absence of a binding directive on point, the Park Service allocated a crew among a park's trees and among the demands following a storm by balancing competing policy considerations, including public safety, tree preservation, staffing and budgetary constraints, and park aesthetics. *See Cope*, 45 F.3d at 449 (acknowledging that an appeal to "underlying fiscal constraints" does not settle the question, since "[b]udgetary constraints . . . underlie virtually all government activity," but such constraints be relevant to whether the discretion is "grounded in the policy of the regulatory regime" (cleaned up)). *Cf. Wells v. United States*, 851 F.2d 1471, 1472 (D.C. Cir. 1988) (holding that the discretionary function exception barred claims that EPA negligently failed to timely remedy the hazards associated with three lead smelters and inform neighboring residents of potential risks). Thus, the Court concludes that the Park Service's

maintenance and inspection regime for the National Mall's trees is protected at step two as grounded in policy.

**b. Warning Signs**

Next, the Plaintiffs allege that the Government negligently failed to "warn pedestrians of any dangerous conditions" by "plac[ing] appropriate warnings or warning signs[.]" Compl. ¶¶ 30–36. This decision, too, falls under the discretionary function exception.

The Plaintiffs urge the Court to adopt a bright-line rule that the placement of "warnings fall outside the bounds of the discretionary function exception[.]" Opp'n at 29.[5] But the D.C. Circuit has squarely rejected such an approach, cautioning against the "mechanistic application" of "analytical frameworks." *Cope*, 45 F.3d at 449 (citation omitted). As the D.C. Circuit put it, "the focus is on the nature of the decision, not on the semantic pigeonhole into which the action can be put[.]" *Id*. On that reading, it rejected a plaintiff's attempt to categorically place decisions "warning the public about hazards resulting from negligence" as outside the exception. *Id*.

Here, the Park Service's choice of where and when to place warning signs reflects a balancing of several policy objectives. In deciding how broadly to restrict access and how long to

[5] The Plaintiffs cite a slew of cases declining to apply the exception to the placement of warning signs. *See* Opp'n at 27–30. But those decisions all turned on a context-specific analysis—such as considering governing directives and policy considerations. And courts have also reached the opposite conclusion in failure-to-warn cases. *Compare Cope*, 45 F.3d at 451–52 (rejecting the exception for inadequate warnings on a slippery road because, among other things, the road was a heavily traveled commuter road already lined with signs), *and Faber v. United States*, 56 F.3d 1122, 1126–27 (9th Cir. 1995) (declining to immunize the Forest Service's failure to warn visitors of known diving hazards where there were mandatory measures in a site-specific plan), *with Shansky v. United States*, 164 F.3d 688, 692–94 (1st Cir. 1999) (holding that NPS's decision to omit warning signs at a historic trading post was protected under the exception because the decision implicated competing concerns of safety, aesthetics, and historical authenticity), *and S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 336 (3d Cir. 2012) (holding that "NPS's decision not to post additional warning signs or add language to existing warning signs regarding the danger of a shoreline barracuda attack" fell under the exception).

keep warnings, Mr. Morrison had discretion to weigh the continuing risk against public access, the park's setting, and the personnel needed to maintain the signs. Mr. Morrison discussed the personnel and resources needed to post and maintain warnings, and the possibility that warning of every visible defect would create a "false sense of security" despite continuing hidden risks. Morrison Decl. ¶¶ 10–11. Rather than place widespread warnings, Mr. Morrison's practice involved "cordoning off the imminent tree risk dangers until [they could] dispatch a team to mitigate the tree hazard." *Id.* ¶ 12. Mr. Morrison further explained: "There's no guidance saying to leave signage there warning people that something had happened, and for how long – how long would you leave them there? For a year? For a month? . . . Once the hazard's mitigated, we move on." Morrison Dep. at 97:2–7. This decision thus fits well within the discretionary function exception.

*Cope* confirms this. There, the D.C. Circuit rejected the Government's reliance on aesthetics to justify inadequate traffic warnings on Beach Drive, but it did so because the road at issue served commuter traffic and 23 other warning and traffic control signs already lined the stretch of road. *Cope*, 45 F.3d at 452. "Beach Drive is not the Grand Canyon's Rim Drive, nor Shenandoah's Skyline Drive," reasoned the Circuit. *Id.* The Circuit then recognized that in other circumstances, the decision to place warning signs may involve "difficult policy judgments balancing the preservation of the environment against the blight of excess signs." *Id.* Such is the case here. By contrast to a commuter road, the National Mall arguably *is* like the Grand Canyon's Rim Drive. It is a repository of our Nation's greatest treasures and monuments, and its purpose is to inspire national pride, not merely to move traffic from point A to point B. Mr. Morrison noted:

> The aesthetic of danger tape and warning signs throughout the park would make the park look like a police crime scene, deterring from the natural beauty of nature and the cleanliness of the park that we preserve daily. Rather than polluting our viewshed with DANGER and WARNING signs throughout the park, we rather

> focus on risk-based tree hazard management through cyclic tree inspections, assessments, and cordoning off the imminent tree risk dangers until we can dispatch a team to mitigate the tree hazard.

Morrison Decl. ¶ 12. Mr. Morrison's words reflect the balancing of policy judgments in deciding the frequency and criteria for placing warning signs on the National Mall.

In the end, although the Court and reasonable minds may disagree with the balance that the Park Service struck between safety and aesthetics, the discretionary function exception is designed to protect against such "judicial 'second-guessing.'" *Gaubert*, 499 U.S. at 323 (quoting *Varig Airlines*, 467 U.S. at 814); *see also Dalehite*, 346 U.S. at 33–34 (The discretion that the statute protects "is not that of the judge—a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course[.]"). Because the decision about whether and how to place warning signs on the National Mall's trees is one that is "based on considerations of public policy," the Court finds that it falls under the discretionary function exception. *Gaubert*, 499 U.S. at 323 (quoting *Berkovitz*, 486 U.S. at 537).

**c. Failure to Properly Trim the Tree at Issue**

Finally, the Plaintiffs allege that the United States failed to "properly and timely prune and/or remove the tree at issue." Compl. ¶ 35. As discussed above, the Park Service's design of its system for maintaining and inspecting the trees on the National Mall involves policy considerations, including balancing aesthetics, budget, and safety. The question is whether the Plaintiffs may challenge a park employee's allegedly negligent implementation of that policy vis-à-vis the tree at issue. The Court concludes that even that implementation falls within the discretionary function exception.

"Discretionary conduct is not confined to the policy or planning level." *Gaubert*, 499 U.S. at 325. Courts have cautioned against distinguishing the *implementation* of a program from its *design*. In *Varig Airlines*, for example, the Supreme Court applied the discretionary function exception to both the Government's decision to "spot-check" airplanes for compliance with safety regulations and its personnel's execution of those checks. 467 U.S. at 819–20; *Cope*, 45 F.3d at 449 ("[W]e reject [the plaintiff's] argument that the government's acts are not discretionary since they involve the 'implementation' of government policy.").

*Merando* is once again instructive. In *Merando*, the Third Circuit characterized a plaintiffs' claim that the Government had negligently "failed to find and remove the hazardous tree" as "essentially . . . a challenge to the Park Service's plan for finding and managing hazardous trees." 517 F.3d at 162, 168. It rejected the plaintiffs' attempt to focus on the action of a crew member as "too narrow." *Id.* at 168. "The Park Service's plan and its execution of that plan constitutes the conduct at issue for purposes of the discretionary function exception analysis," the court reasoned. *Id.*; *see also Gonzalez v. United States*, 814 F.3d 1022, 1036 (9th Cir. 2016) (Courts should not permit "the design-implementation distinction to override the discretionary function exception analysis in contravention of the [Supreme] Court's clear command: we look first to whether a policy permits an agent discretion, and if it does, then we must presume that an agent's act or omissions are grounded in policy, whether or not we suspect that the discretion involved has been abused[.]"); *Autery*, 992 F.2d at 1527–28, 1531 (rejecting the plaintiffs' argument that the exception did not protect the manner in which employees administered the tree-inspection program because carrying out the plan required balancing safety risks, competing programs, preservation, and limited resources).

Here, even assuming that a Park Service employee negligently failed to trim the tree at issue, the determination of which trees to trim—and therefore, whether to trim a particular tree—remained discretionary and susceptible to policy analysis. *Gaubert*, 499 U.S. at 325 ("The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."). As in *Varig Airlines*, the Park Service employees were "specifically empowered to make policy judgments" in their decisions to tag or not tag certain trees and prune or not prune certain trees. 467 U.S. at 820. The policy judgments undergirding the National Mall's tree program permeated to the on-the-ground inspections of trees. Whether a particular tree warranted closer inspection, immediate pruning, or a warning meant deciding when safety measures justified restricting visitors' use of the park or compromising the aesthetic enjoyment and therefore implicated more than the application of "technical or scientific standards." *Walen*, 246 F. Supp. 3d at 465 (cleaned up). Thus, the implementation of the park's inspection and maintenance program left room for policy judgments in the field, placing that conduct under the exception. *Gaubert*, 499 U.S. at 324 ("When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.").

Critically, this conclusion aligns with Congress's purpose in enacting the discretionary function exception. Holding Park Service employees liable for their decisions whether to trim specific trees on the National Mall risks "seriously handicap[ping] efficient government operations," *United States v. Muniz*, 374 U.S. 150, 163 (1963), and therefore runs roughshod over Congress's "concern for protecting against unwarranted judicial intrusion into areas of governmental operations and policymaking," *Gray v. Bell*, 712 F.2d 490, 507 (D.C. Cir. 1983).

* * *

The Court recognizes that the Plaintiffs suffered a great deal when the tree limb in question fell and struck them on the National Mall. But in enacting the discretionary function exception, Congress "retained a measure of the federal government's 'exceptional freedom from legal responsibility,'" knowing that "[s]ome negligent acts may go unrecompensed." *Shuler*, 531 F.3d at 936 (quoting *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 388 (1939)). Whether the Government was negligent in this case is not for the Court to say because its conduct "involved considerations of public policy that [the Court has] no power to second-guess." *Id.* The United States is correct that the discretionary function exception shields the Government's conduct, depriving the Court of subject-matter jurisdiction over this suit.[6]

[6] Having found that the discretionary function exception shields the challenged decisions, the Court does not reach the Defendant's alternative argument on the merits. But the Court notes that, on this record, the Plaintiffs' underlying claim is dubious. The United States is liable under the FTCA as a private person would be under District of Columbia law. 28 U.S.C. § 1346(b)(1). Under District of Columbia law, a landowner owes those lawfully on the property "reasonable care under all of the circumstances." *Sandoe v. Lefta Assocs.*, 559 A.2d 732, 738 (D.C. 1989). A landowner must conduct "reasonable supervision and inspection of the premises," but the owner is "not an insurer of the condition of his [property]." *Id.* at 740 (alternation in original) (cleaned up). To hold a landowner liable for a dangerous condition, a plaintiff therefore "must show that the [defendant] had actual or constructive notice of a dangerous condition that he failed to correct." *Croce v. Hall*, 657 A.2d 307, 310 (D.C. 1995). Constructive notice means that the condition "existed for such a duration of time that [the defendant] would have been aware of it if [the defendant] had exercised reasonable care." *McKenney v. Wash. Metro. Area Transit Auth.*, 318 A.3d 559, 564 (D.C. 2024) (alterations in original) (quoting *Lynn v. District of Columbia*, 734 A.2d 168, 171 (D.C. 1999)). Therein lies the problem for the Plaintiffs: Their own expert stated that the branch at issue was "vegetated with green foliage" and that the fracture "did not appear aged, desiccated, and weathered, which indicates the initiation of failure was recent." Larson Suppl. Rep. at 2; DSOF ¶ 8; PSOF ¶ 8. The Plaintiffs' expert described it as "highly unlikely" that the fracture "was visibly present at the time of the level 1 inspection on January 8th, 2022." Larson Suppl. Rep. at 3. The Government's expert likewise described the defect as "hidden" and one "that could not be seen directly during the prescribed inspections." Carlson Rep. at 13. Furthermore, the Plaintiffs' expert conceded that there is no single national standard of care for tree management, only "a compilation of consensus standards," the ANSI standards among them being "voluntary consensus standards." Larson Dep. at 48:7–17, 133:18–22. The Court thus doubts that the Plaintiffs would survive summary judgment on the record presently before it.

## CONCLUSION

For the foregoing reasons, the Court dismisses this action for lack of subject-matter jurisdiction and denies the United States' Motion for Summary Judgment, ECF No. 21, as moot. A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: October 5, 2026